Filed 2/5/26  In re A.L. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.L., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.N. et al.,<br><br>Defendants and Appellants. | D086549<br><br>(Super. Ct. No. J520079B) |

APPEALS from orders of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Conditionally reversed and remanded.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant A.L.

Catherine L. W. Markel, under appointment by the Court of Appeal, for Defendant and Appellant C.N.

David Smith, Acting County Counsel, Lisa M. Maldonado, Chief County Counsel and Evangelina Woo, Deputy County Counsel, for Plaintiff and Respondent.

C.N. (Mother) and A.L. (Father) appeal from the juvenile court's findings and orders terminating parental rights to their child A.L. at the Welfare and Institutions Code[1] section 366.26 hearing. Mother contends the court erred in failing to conclude the beneficial relationship exception to adoption applies with respect to her. She also contends the Health and Human Services Agency (the Agency) failed to comply with the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) and its California counterpart (§ 224.2) in multiple ways. Mother requests conditional reversal and remand for compliance with ICWA. Father adopts all of Mother's arguments.[2]

We reject the contention the court abused its discretion in declining to apply the beneficial relationship exception in this case. However, the Agency concedes ICWA error as to two of the parents' contentions, and we accept this concession. We therefore conditionally reverse the juvenile court's order and remand the matter for compliance with ICWA, subject to reinstatement if the juvenile court determines A.L. is not a child of Native American ancestry.

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Father does not apply Mother's arguments to himself and does not raise any additional separate arguments.

2

FACTUAL AND PROCEDURAL BACKGROUND[3]

## I.

*The Initial Investigation and Petition*

The Agency received a referral regarding then two-year-old A.L. on March 19, 2024, after a domestic violence altercation between his parents. During this incident, Father slashed the tires on Mother's vehicle. Mother disclosed to responding officers that during a prior domestic violence incident, Father kicked A.L. in the chest. When Mother tried to intervene, Father grabbed her by the neck, pushed her against a wall, slapped her, and strangled her, all in front of A.L. Officers observed bruises under Mother's chin. After Mother and A.L. were taken to a hospital, A.L. tested presumptively positive for having fentanyl in his system.[4]

The Agency became aware of a restraining order Mother obtained against Father. In the application for the restraining order, Mother recounted daily abuse by Father between 2019 and 2020, as well as five to 10 instances of strangulation. Father's abuse had occurred while Mother was pregnant with A.L. The restraining order was set to expire in June 2026.

A social worker interviewed Mother while she was at the hospital. Mother reluctantly agreed to a safety plan, but she refused a drug test. She also refused to sign a document allowing A.L. to receive medical treatment if necessary. Mother became angry at one point and threw her cell phone at the door. When A.L. began to cry, Mother did not try to comfort him.

---

[3] Because Father does not make arguments related to his personal relationship with A.L. or his conduct throughout the case, we primarily focus our review of the background on Mother.

[4] These preliminary results were later confirmed.

When Father was interviewed, he denied hitting Mother or A.L. He said he argued with Mother because "she snaps at [A.L.] She yells at him." Father admitted using methamphetamine and asserted Mother used the drug, too. He did not know how A.L. may have tested positive for fentanyl.

On March 21, 2024, the Agency filed a petition on behalf of A.L. under section 300, subdivision (b). The Agency alleged A.L. was at risk due to his presumptive positive test for fentanyl, both parents' use of methamphetamine, as well as ongoing domestic violence between the parents. The Agency also alleged Mother's rights to an older sibling had been terminated in 2021, after Mother failed to complete court-ordered drug treatment.

The juvenile court detained A.L. in a licensed foster home four days after the petition was filed.

## II.

### *The Jurisdiction and Disposition Phase*

Julie, A.L.'s initial caregiver, reported he was adjusting well and had begun to call his caregivers "Momma and Poppa." Julie invited Mother to attend A.L.'s dental appointment, but Mother did not join them. Mother had three visits with A.L. between his removal and the jurisdiction and disposition hearing that was initially set for April 15, 2024. At the first visit, Mother embraced A.L. and appeared attentive and engaged. Mother was almost an hour late for her second visit. At the end of this visit, A.L. cried and latched onto Mother. He was eventually distracted and encouraged to leave.

On April 15, Mother requested a contested jurisdiction and disposition hearing.

4

Mother was 20 minutes late to her next visit and then cancelled the following visit due to illness. Mother cancelled the next three visits as well, citing illness and her entry into a drug detoxification program. Mother then failed to show up without explanation on the fourth scheduled visit. She was almost an hour late for a visit in May 2024, explaining she had seen her ex-husband outside her home and did not feel she could leave with him there. Once Mother did arrive, she and A.L. played together. She buckled A.L. into his car seat at the conclusion of the visit, and they said goodbye.

Mother was again late for her next visit. A.L. was excited to see her and they played at a splash pad at a park. At the end of this visit, Mother and A.L. cleaned up and walked to the supervisor's vehicle. Mother buckled A.L. into his car seat, they said goodbye, and she left.

Mother asked to reschedule the next visit, citing anxiety. The rescheduled visit was ultimately canceled because Mother failed to respond to attempts to confirm her attendance.

Mother canceled a visit scheduled for the week of May 20, 2024. Mother indicated she was starting a new job. An additional two subsequent visits were canceled, the first because of Mother's tardiness, and the second because Mother failed to confirm the visit beforehand. Mother attended two visits in June 2024, but she was late for both. At these visits, A.L. was excited to see Mother and showed her affection. He got teary upon saying goodbye to Mother on the second visit, but was distracted when she gave him a tablet to help the transition. The following visit was cancelled when Mother did not arrive within 45 minutes of the scheduled start time, as the social worker did not have sufficient supplies to continue to wait.

Mother attended a scheduled visit on June 17, 2024. But the following week, Mother cancelled her visit, citing illness.

A.L.'s caregiver reported Mother did not call A.L. on the phone or have video visits between the scheduled in-person visits. A.L.'s daycare providers said he did well some days and struggled on others. The daycare staff noticed that he struggled a bit more than usual on days when Mother cancelled or missed the scheduled visitation, as he could see other children who were also in foster care being picked up for their visits.

At the contested jurisdiction and disposition hearing held on July 5, 2024, the court sustained the petition, ordered A.L. placed out of his home, and ordered reunification services be provided to both parents.

III.

*The Reunification Period*

On November 22, 2024, A.L. was moved to the home of nonrelated extended family members Eduardo and Biviana. These caregivers are the legal guardians to three of A.L.'s half-siblings.

In preparation for the six-month review hearing scheduled for January 7, 2025, a social worker recommended termination of reunification services as to both parents. Father was incarcerated. Mother had tested positive for illicit drugs on July 2, September 20, and December 2, 2024. Mother had entered and left three different drug treatment programs, and she had not enrolled in a domestic violence treatment program. Mother had been referred to the Incredible Families program, which provides group and individual therapy services, plus one supervised visit with a meal included each week. The Incredible Families clinician attempted to contact Mother several times, and Mother either failed to respond or did not show up for the appointments she had scheduled to complete the intake process. Mother also did not complete any of the parenting education service programs to which she had been referred.

6

During this review period, Mother saw A.L. in person twice and had one video call with him. Before September 20, 2024, Mother's last in-person visit was July 24, 2024, which was just before she left a drug treatment program. After July 24, she did not respond to the Agency's attempts to schedule visits until September 20, which is when she agreed to video visits. She attended one video visit and did not appear for the other. Mother also did not attend any of the in-person visits she had scheduled after September 20, 2024. The social worker referred Mother to the Family Visitation Center (FVC) to allow Mother to have visits closer to her treatment center. This referral was closed several weeks later due to Mother's lack of response.[5] The social worker opined that Mother's infrequent visitation negatively impacted the bond between A.L. and Mother.

Mother finally visited A.L. in person on December 8, 2024. A.L. was excited to see her, and he cried at the end of the visit.

Mother attended two of five scheduled visits in January 2025. Two of the cancelled visits were due to Mother failing to show, but the third cancelled visit was due to the visitation monitor having car problems.

A.L.'s caregivers reported the transition to their home was initially difficult, as A.L. really missed his previous caregivers. A.L. would often tear up when he saw a photo of his previous female caregiver. After his most recent two visits with Mother, A.L. was more emotional and not himself. His appetite decreased after these visits.

On February 7, 2025, the juvenile court terminated reunification services for both parents and scheduled a section 366.26 hearing to determine a permanent plan for A.L.

---

[5] Later in the case Mother did eventually use the FVC for visitation.

# IV.

## *The Permanency Plan Phase*

Prior to the section 366.26 hearing, which was set for June 4, 2025, the Agency recommended the termination of parental rights and a permanent plan of adoption for A.L. The social worker noted A.L. was generally adoptable. A.L.'s caregivers wished to adopt him and were committed to meeting his needs. By this time, A.L. was comfortable in the caregivers' home. The social worker noted the caregivers had known A.L. since he was three months old, and he had been living with them since November 22, 2024. A.L. sought the caregivers out to meet his daily needs.

In April 2025, Mother informed the social worker she was pregnant. She asked for a second weekly visit to be added to her regular weekly visit. Between March and May 2025, Mother attended five scheduled visits through the FVC; still, two of the scheduled visits were canceled due to Mother's failure to confirm. Mother also attended three two-hour visits at a different location. A maternal aunt attended one visit with Mother, and in the social worker's view, A.L. interacted with his aunt in a manner similar to how he interacted with Mother. He displayed affection by exchanging hugs and kisses with both women. A.L. had tears in his eyes as the group began cleaning up near the end of the visit and Mother started to say goodbye, but he became distracted when the social worker picked him up. The visit ended without A.L. showing visible signs of distress.

At other visits, A.L. initially indicated sadness at having to leave Mother, then often was easily distracted and transitioned without significant distress. The caregivers reported, however, that it usually took A.L. a day to calm down after visiting with Mother; he would often seem angry or sad after visits. According to the caregivers, A.L. sought out the female caregiver for

comfort. The social worker reported A.L. threw tantrums when he was told there was a visit planned with Mother but she failed to attend; the caregivers began to withhold information about the visits from A.L., which allowed him to be able to continue with his daily routine without disruption when the visits did not end up occurring.

Over a 14-month period, Mother had only 24 visits with A.L. Although A.L. and Mother engaged in positive interactions during those visits, the social worker compared Mother's visits with A.L. to that of a friendly visitor. In the social worker's assessment, it would not be detrimental to A.L. to terminate his parents' rights, when the severing of his relationship with Mother was weighed against the benefits of adoption.

In response to the Agency's recommendation for a permanent plan of adoption, both parents requested a trial.

During the intervening period before the trial, Mother attended five more visits at the FVC and another supervised visit at a park. She canceled two visits.

On June 9, 2025, Mother informed the social worker she was discharging herself from her drug treatment program, against the advice of program staff. Mother requested her visits with A.L. at the FVC be reduced to once a week, citing her desire to attend an intensive outpatient program. Mother attended a visit with A.L. on June 18, 2025. Mother then cancelled a visit on July 1, citing exposure to Covid. The Agency's addendum report of July 23, 2025, described Mother's visits as "sporadic" during the period since the previous report was filed, mostly due to Mother's self-reporting of a medical condition preventing her from visiting.

On July 23, 2025, Mother's attorney requested the trial be continued because Mother had missed multiple visits over the prior few weeks. The

juvenile court denied the request, finding no good cause to continue the matter.

County counsel entered the section 366.26 report and several addendum reports into evidence. Mother's counsel submitted three packets of documents, and Father's counsel submitted two certificates of completion, one for a parenting program and the other for a residential drug treatment program.

Mother testified at trial and acknowledged that the first month after A.L. was removed, she did not visit him. She said that she had been offered only one weekly visitation with A.L., but after she entered a residential treatment program in 2025, she began having two visits per week. Eventually her visitation again reverted to a single weekly visit. Mother admitted her visits were not consistent from July to October 2024. Mother testified there was no excuse; she explained she was struggling with depression and she "wasn't quite all there."

At visits, Mother played with A.L. and read with him. When Mother was asked by her attorney how she assumed a positive parental role during the visits, she responded, "I know my son. I raised him for the two years. . . . I know I messed up, but I don't see why, like—I need a minute to know how to answer this one." Mother asserted termination of parental rights would be detrimental to A.L. because they were very close, and this was the longest she had ever been away from him. During visits, A.L. told her he wanted to stay with her, and, according to Mother, A.L. was excited to be a big brother to Mother's youngest child. Mother testified she had called the caregiver the week before trial to schedule a visit, but he did not answer. But when questioned further, Mother conceded her decision to leave the inpatient drug treatment program against staff advice led to her having fewer visits with

A.L. When asked if she was aware that when she canceled visits, the cancellations caused trauma to A.L, she said, "I understand that, but that shouldn't be held against me."

A.L.'s counsel pointed out A.L. had been out of the parents' care for 18 months, and the lapse in contact between July to October was significant. In counsel's view, although A.L. was excited to see Mother at visits, she was a friendly face, but she was not a parental figure to him. Counsel noted A.L. was thriving in his placement, where he lived with three of his half-siblings. The caregivers wanted to adopt him, and they were not in favor of a plan of legal guardianship because of concerns that repeated back and forth would cause A.L. to continue to be dysregulated. A.L.'s attorney requested the court follow the Agency's recommendation for a plan of adoption.

County counsel agreed with minor's counsel's views and cited Mother's history of canceled visits and her failure to maximize the visitation that had been available to her. County counsel argued the inconsistent visitation led to trauma for A.L., and undermined the possibility for a substantial positive bond to grow between A.L. and Mother.

The juvenile court considered the documentary evidence and testimony. The court ultimately found neither parent met her/his burden to show an exception to adoption applied. The court found Father did not regularly and consistently visit A.L. As to Mother, the court explained, "I don't think I can make a finding that she has regularly and consistently visited the child," even though "[s]he has made a lot of efforts" and "has visited quite a bit." The juvenile court went on to find that even if Mother met the first prong, she did not meet the second or third. Mother's own description of her relationship with A.L. was similar to an aunt or uncle coming to visit; she described herself playing with A.L. In addition, the court was concerned

11

about the reports of dysregulation caused by both visitations with Mother, as well as the times when she cancelled or failed to show for visits. Ultimately, the court stated, "When I weigh the benefits of adoption versus the relationship as described in the evidence, I would find that adoption and the permanency of adoption would outweigh whatever relationship there is right now."

After making these findings, the court terminated both parents' rights, declared A.L. free for adoption, and designated the caregivers as his prospective adoptive parents.

DISCUSSION

I.

*The Juvenile Court Did Not Err in Determining the Beneficial Relationship Exception Does Not Apply*

The Legislature has declared California has an interest in providing stable, permanent homes for children who have been removed from parental custody and for whom reunification efforts with their parents have been unsuccessful. (§§ 366.25, subd. (a), 366.26, subd. (b).) Once reunification services have been terminated, the focus of a dependency proceeding shifts from family preservation to promoting the child's best interests, including the child's interest in a placement that is stable, permanent, and allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534; *In re Marilyn H.* (1993) 5 Cal.4th 295, 306.)

"The sole purpose of the section 366.26 [permanency plan] hearing is to select and implement a permanent plan for the child after reunification efforts have failed." (*In re J.D.* (2021) 69 Cal.App.5th 594, 612.) At the permanency plan hearing, the court may order one of three alternatives: terminate parental rights and order adoption, appoint a legal guardian, or

12

place children in longterm foster care. If the child is adoptable, there is a strong preference for adoption over the other two alternatives. (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224 (*B.D.*).)

As a result of the strong preference for adoption, "[o]nce the court determines by clear and convincing evidence that a child is likely to be adopted, the burden shifts to any party opposing adoption to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)." (*In re D.O.* (2016) 247 Cal.App.4th 166, 173 (*D.O.*).) Here, it is undisputed A.L. is likely to be adopted. Rather than contest this finding, Mother, joined by Father, argues only that the beneficial parental relationship exception applies here (§ 366.26, subd. (c)(1)(B)(i)).

The parental-benefit exception applies where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)), including where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" (*id.*, subd. (c)(1)(B)(i)). This exception "allows a child a legal basis for maintaining a relationship with the child's parent if severing that relationship would, on balance, harm the child," thereby "preserv[ing] [a] child's right to [a] relationship [with his or her parent] even when the child cannot safely live with that parent." (*In re Caden C.* (2021) 11 Cal.5th 614, 643 (*Caden C.*).)

The beneficial relationship exception requires a parent to prove three elements: "(1) regular visitation and contact, taking into account the extent of visitation permitted; (2) a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and (3) a showing that terminating the

13

attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re M.G.* (2022) 80 Cal.App.5th 836, 847.)

"We review the juvenile court's [factual] findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parental relationship, for substantial evidence." (*B.D., supra*, 66 Cal.App.5th at p. 1225.) In undertaking this review, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts,' " and we will not disturb the juvenile court's findings even where substantial evidence to the contrary also exists. (*Caden C., supra*, 11 Cal.5th at p. 640, citations omitted.) However, "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*) A court abuses its discretion "by making an arbitrary, capricious, or patently absurd determination." (*Id.* at p. 641, cleaned up.)

As to the first prong, Mother challenges the sufficiency of the evidence to support the juvenile court's finding that Mother did not regularly and consistently visit A.L. According to Mother, the court should have focused on the evidence that she did visit A.L. regularly for a longer duration of the dependency period than the portion of time during which she did not have contact with A.L.

As previously set out, the determination whether a parent has maintained consistent visitation and contact with the child is a factual one. (*Caden C., supra*, 11 Cal. 5th at p. 640.) Substantial evidence may support a court's factual determination regarding the nature of the parent's visitation, " 'even though substantial evidence to the contrary also exists and the trial

14

court might have reached a different result had it believed other evidence.' " (*Ibid.*)

Here, there is abundant evidence to support a finding that Mother, despite visiting "quite a bit," did not maintain *consistent* visitation and contact with A.L. throughout the case. For example, between A.L.'s removal in March 2024 and the jurisdiction hearing in mid-April 2024, Mother saw A.L. only three times. During the pendency of the contested jurisdiction and disposition trial, Mother canceled or simply failed to show up for visitation no fewer than seven times. Beyond this, Mother was between 20 minutes to an hour late for most of the visits when she did end up attending. And between the in-person visits, Mother did not call or attempt video contact with A.L.

Then, during the first six months after the contested jurisdiction and disposition hearing, Mother had only two in-person visits and one video call. Mother did not see A.L. in person at all between July 24, 2024 and December 8, 2024. In January 2025, Mother canceled two of five scheduled visits. Although there was a short period of time during the pendency of the section 366.26 hearing when Mother's visitation became more regular, as of July 2025, when Mother left an inpatient drug treatment program, she reduced her visitation from twice weekly to one time per week. In fact, Mother's lackluster visitation led her attorney to request that the contested hearing be continued to provide her with additional time to participate in more visits with A.L. In sum, although Mother did make strides toward creating more consistent and regular visitation with A.L. while the section 366.26 hearing was pending, there is abundant evidence that Mother's visits with A.L. throughout the course of this proceeding lacked frequency and consistency.

Mother, however, compares her visitation to that of the father in *In re D.M.* (2021) 71 Cal.App.5th 261, 268 (*D.M.*). She notes that like the father in

15

*D.M.*, her "visitation wasn't perfect, but she had been visiting regularly for the last seven months at the time the court made its finding." Mother's argument, however, is an improper request that this court reweigh the evidence and reach a different conclusion, despite the deferential nature of substantial evidence review. Indeed, in *D.M.*, the appellate court concluded substantial evidence supported the finding by the trial court in that case that the father *had* regularly visited the children. (*Id.* at p. 270.) A true application of the same standard the court applied in *D.M.* to this case means that we must consider only whether the evidence, when viewed in the light most favorable to the court's determination, supports the trial court's factual finding in this matter. And we conclude it does.

Although the court did not need to reach the second or third prong, given its finding on the first prong, it nevertheless considered and made findings on the second and third prongs of the beneficial relationship exception. As to the second prong, the court made a finding that Mother's relationship with A.L. was more akin to that of "an aunt or uncle." To satisfy this second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra,* 11 Cal.5th at p. 636.) Factors involved in determining the benefit of the relationship include " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " as well as "how children feel about, interact with, look to, or talk about their parents." (*Id.* at p. 632.) "A positive attachment between parent and child . . . is nurturing and provides the child with a sense of security and stability," and "an emotional attachment is one where the child views the

16

parent as more than a mere friend or playmate." (*B.D., supra,* 66 Cal.App.5th at p. 1230.) The requisite "significant attachment" develops from an "adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Mother contends the juvenile court failed to "specifically rule on . . . whether or not it would be beneficial to continue Mother's relationship with A.L. or consider any specific components." In her view, the court seemingly did not "sufficiently examine[ ]" the nature of her relationship with A.L., and thus erred in failing to find she met this prong. But here, Mother identifies facts in the record that she believes weigh in her favor regarding the nature of her relationship with A.L., choosing to ignore evidence that could lead to a contrary finding. But, again, the relevant question on appeal is not whether there might be some evidence from which the court could have found the existence of a substantial emotional attachment. The question is instead whether there is sufficient evidence to support the finding the juvenile court made—i.e., that A.L. did not have a substantial, positive emotional attachment with Mother. (See *Caden C., supra*, 11 Cal.5th at pp. 639–640 [court finding as to existence of a beneficial parental relationship reviewed for substantial evidence].) And for these purposes, the emotional attachment between a child and a parent is to be considered *from the child's perspective.* (*Id.* at p. 633 [second element addresses 'the psychological importance of the relationship for the child'].) "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child." (*Id.* at p. 632.)

17

Here, the evidence supports the trial court's finding the emotional attachment between Mother and A.L. was not more than that of an extended family member who enjoyed playtime together, rather than one of enduring support and safety. The record does not demonstrate Mother attended any of A.L.'s appointments or the services provided to A.L. One referral that would have allowed Mother and A.L. to obtain family therapy was closed due to Mother's failure to respond. The evidence also shows Mother did not call or otherwise inquire between visits—which were already generally inconsistent—to inquire about A.L.'s well-being. And Mother was unable to provide a satisfactory response when questioned about how she had assumed a positive parental role during her visits with A.L. As additional evidence that the nature of Mother's relationship with A.L. was not different from that of a nonparental relative, at one visit where A.L.'s maternal aunt attended along with Mother, A.L. interacted with Mother and his aunt in similar fashion.

This is not surprising, given that at the time of the contested section 366.26 hearing, A.L. had spent almost half of his life in someone other than Mother's care. A.L. referred to his current caregiver as "Mommy." He sought out his caregivers for comfort and relied on them for his daily needs. A.L. experienced some emotional disruption from both the termination of visits with Mother, as well as scenarios when Mother canceled after he had been taken to the visitation location. But when A.L. was not informed about a pending visitation ahead of time and Mother canceled, he experienced no emotional disruption.

The record thus supports the juvenile court's conclusion that the attachment between A.L. and Mother was not sufficiently strong that A.L.

18

would benefit from continuing the relationship, such that the preference for adoption could be overcome (*Caden C., supra*, 11 Cal.5th at p. 636).

Concerning the third prong of the beneficial relationship exception— whether "termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because of the relationship between the parent and child—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption, despite it benefits. (*Caden C., supra*, 11 Cal.5th at p. 633.) In doing so, the court "needs to determine . . . in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) Although a child might suffer effects such as "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression," as a result of the loss of relationship with a parent, the benefits of an adoptive home "may alleviate the emotional instability and preoccupation leading to such problems," and could "provid[e] a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid.*)

In our assessment, no abuse of discretion has been shown in connection with the court's ultimate conclusion that any detriment A.L. might suffer as a result of severing of his relationship with Mother would not outweigh the substantial benefit afforded him by the stability of adoption. It was clear from the Agency's reports that A.L. had become both physically and emotionally reliant on his caregivers; they fulfill his daily needs, and he repeatedly sought them out for comfort when upset. Moreover, although Mother suggests the severing of her parental relationship would be detrimental to A.L. in part because of her pregnancy and A.L.'s excitement about having a younger sister, this focus ignores the fact that A.L. was already living with siblings—three half-siblings, with whom he had positive

19

relationships. It was reasonable for the court to conclude the constancy and emotional stability provided by A.L.'s caregivers and his already established sibling bonds outweighed the benefit to A.L. of continuing his relationship with Mother and an as-of-yet unborn sibling.

Moreover, we reject Mother's attempt to portray the court's commentary surrounding this ultimate determination as indicating it improperly weighed Mother's "progress or lack thereof" with respect to her substance abuse case plan and sobriety. The fact that the juvenile court mentioned Mother's issues with sobriety was not improper, as "[i]ssues such as those that led to dependency often prove relevant to the application of the exception." (*Caden C., supra*, 11 Cal.5th at p. 637.) Although a "parent's continuing difficulty with mental health or substance abuse may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent," it nevertheless remains true that "a parent's struggles with substance abuse, mental health issues, or other problems could be directly relevant to a juvenile court's analysis in deciding whether termination would be detrimental." (*Id.* at pp. 638–639.)

For example, evidence may tend to show that a parent's "continuing substance abuse and mental health issues contributed to [a child] forming what might have been a 'narrow' bond with" that parent. (*Caden C., supra*, 11 Cal.5th at p. 638.) This appears to be the case here. When the trial court referred to Mother's substance abuse history and noted the dependency scheme provides little time for a parent to fully overcome substance abuse challenges, the court was not assigning moral blame, but merely acknowledging that Mother's struggles with sobriety likely affected her ability to do other things that could have strengthened her relationship with

A.L.  Indeed, just after discussing the unique challenges of the timing of dependency cases where drug addiction is a major factor in the initiation of the dependency proceeding, the court specifically considered the evidence regarding the nature of Mother's relationship with A.L.  It stated, "[W]hen I weigh the benefits of adoption versus *the relationship as described in the evidence*, I . . . find that adoption and the permanency of adoption would outweigh *whatever relationship there is right now*."  (Italics added.)  We view the court's acknowledgment of Mother's substance abuse struggles as merely that—an acknowledgement that the nature of substance abuse often makes it difficult for a parent to engage in behaviors that would lead to the deepening of, rather than a narrowing of, a bond with a child.  (See *Caden C., supra*, 11 Cal.5th at p. 638.)

We similarly reject Mother's suggestion that the court employed an improper standard through its descriptive assessment of the nature of the bond between her and A.L. as being akin to that of a "relative visitor, playing with the child."  Mother complains the court should not have considered whether she occupied a " 'parental role' or whether a 'parental relationship' existed."  But the court's comments do not reflect a concern that Mother did not occupy a parental role or that the lack of a "parental relationship" with Mother formed the basis of the court's determination that, on balance, terminating the relationship would not cause detriment that would outweigh the benefits of adoption.  Rather, the court was explaining the nature of the relationship from A.L.'s point of view, i.e., that Mother was an enjoyable visitor with whom to play, involved a bond that lacked the necessary depth to overcome the legislative preference for adoption at this late stage in the dependency process.

21

Given A.L.'s young age throughout this proceeding, his need for permanency and stability was paramount. The caregivers were willing and able to provide that permanency. In making its assessments in this matter, the court properly considered a broad range of factors, ultimately concluding the nature of A.L.'s emotional connection with Mother was not sufficiently deep and significant, such that the detriment from its loss would not outweigh the substantial benefit adoption would provide. In the end, we cannot say this record presents an extraordinary case where preservation of parental rights outweighs the preference for adoption. (See *In re G.B.* (2014) 227 Cal.App.4th 1147, 1166 [" ' "it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement" ' "].) Rather, the court reasonably concluded maintaining A.L.'s relationship with Mother did not outweigh " 'the security and the sense of belonging a new family would confer.' " (*Caden C., supra*, 11 Cal.5th at p. 633.) There was thus no abuse of discretion in the court declining to apply the beneficial parent-child relationship exception in this matter.

## II.

*Accepting the Agency's Concession of Partial ICWA Error, We Conditionally Reverse and Remand*

Congress enacted ICWA to address concerns regarding the separation of Native American children from their tribes through adoption or foster care placement with non-Native American families. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) In dependency proceedings, the juvenile court and the Agency have an "affirmative and continuing duty to inquire whether a child . . . is or may be" a child of Native American ancestry. (§ 224.2, subd. (a).) This duty of inquiry extends to asking parents, legal guardians, extended family

members and others who have an interest in the child whether they have Native American ancestry. (*Id*., at subd. (b)(2).) ICWA defines " 'extended family member' " by "the law or custom of the . . . child's tribe" or, absent such law or custom, as "a person who has reached the age of eighteen and who is the . . . child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [" 'extended family member' . . . defined as provided in [§] 1903" of ICWA].)

Further duties of inquiry are required where there is reason to believe a child is a Native American child; and notice is required where there is reason to know a child is a Native American child. (§ 224.2, subds. (e) & (f); *In re Dezi C.* (2024) 16 Cal.5th 1112, 1132–1133 (*Dezi C.*).) Alternatively, a juvenile court may "make a finding that an agency's inquiry and due diligence were 'proper and adequate,' and the resulting record provided no reason to know the child is a [Native American] child, so ICWA does not apply. (§ 224.2, subd. (i)(2)." (*Dezi C.,* at p. 1134.) We generally review the juvenile court's ICWA findings for substantial evidence, but where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051.)

Here, the ICWA-010 form attached to the Agency's petition indicated ICWA inquiry was conducted with both parents. At that time Mother denied Native American ancestry. Similarly, at the detention hearing, Mother denied Native American ancestry and filed an ICWA-020 reflecting the same. Maternal uncle David N. and maternal aunt Clarissa N., both of whom were assessed for emergency placement, denied Native American ancestry. Later, in the jurisdiction and disposition report, it was reported that Mother indicated no one in her family ever lived on a reservation, attended a tribal

23

school, or received medical or financial assistance from a tribe. Initially, Father and paternal grandmother Veronica R. also denied Native American ancestry, instead identifying themselves as Mexican. Father could not be reached for the detention hearing.

The jurisdiction and disposition report detailed the Agency's family finding efforts. The Agency had identified 41 individuals who might be related to Mother and 36 individuals who might be related to Father. The Agency mailed a Relative Notification letter to each person to inform them A.L. was in protective custody. The letter also inquired if the family had Native American or Alaskan Native heritage. At the time of the jurisdiction and disposition hearing on April 15, 2024, all responses from contacted potential family members were "Pending."

The Agency contacted Father on April 17, 2024, at which time he informed a social worker A.L.'s paternal family had Native American ancestry, but no family member was a member of a tribe, lived on tribal land, attended a tribal school, or received financial or medical assistance from a tribe. Father stated, "My grandpa said we have Yaqui Indians in our family. I think some of our family does look Native. I don't know one way or another." No father was listed on Father's birth certificate, and he had been raised by his mother, Veronica R., and a stepfather. Father's siblings were Jose R. and Marissa L. The social worker called Veronica R. on May 14, 2024, and she indicated her family had Mayan and Yaqui ancestry. She said she wanted to call A.L.'s paternal great-grandfather to obtain more genealogical information. The social worker spoke with paternal cousin Serafina V., who denied having Indian ancestry. He also left a voice message for maternal grandmother Eva O.

The social worker reached out to Veronica R. again and obtained contact information for Guadalupe L., A.L.'s paternal great-grandfather. When contacted, Guadalupe L. expressed surprise that A.L. was in foster care and did not continue the conversation. Veronica R. later explained that Guadalupe L.'s "grandparent was from Sonora. She was Yaqui and Mayan, back in the day."

When Father appeared in court on June 5, 2024, he submitted an ICWA-020 form that said he was "maybe Yaki [*sic*], don't know." The social worker reached out to paternal great-grandfather Guadalupe L. again on June 17, 2024, and was given "genealogical information about his ancestors who he believed to be Yaqui, the child's great-great-great-grandparents who spoke Yaqui, and came from Sonora, Mexico."

The following day, June 18, a different social worker emailed a representative from the Pascua Yaqui tribe in Arizona, asking if the family members or A.L. were enrolled or eligible for enrollment. The email listed A.L., Father, paternal grandmother Veronica R., paternal great-grandfather Guadalupe L., paternal great-great-grandfather, Abraham C.-L., and paternal great-great-grandmother Cristina V. de L., along with dates of birth for all except the paternal grandmother and paternal great-grandfather. The email concluded: "We don't have the Great-Great-Great grandparents' names, or the great-great-great-great grandparent's names. Guadalupe L[.] stated that his great-grandparents were Yaqui, and spoke the language, but that they came from Sonora, Mexico." (Formatting omitted.)

The Agency also sent a certified letter with the family's information to the Pascua Yaqui Tribe on July 1, 2024. The social worker left a voicemail for the tribe's representative the same day, as well as two days later. The social worker also sent another email on July 3, 2024.

At the contested jurisdiction and disposition hearing on July 5, 2024, the court found ICWA did not apply. At that point in time, the Agency had received no response from the Pascua Yaqui Tribe. County counsel requested leave to set a special hearing if additional information relevant for ICWA purposes was received.

The paternal grandmother and an unidentified paternal uncle appeared in person at the contested six-month review hearing on February 7, 2025. The juvenile court conducted ICWA inquiry with both individuals. At this time, the paternal grandmother denied anyone in her family was a member of a tribe or was eligible to be. However, she indicated the family had Native American ancestry. The paternal grandmother and the paternal uncle both indicated that their great-grandmothers were Yaqui and Mayan, of the Sonora Nulleja Tribe. County counsel informed the court the Pascua Yaqui Tribe had sent a response stating A.L. was not eligible for membership, and the Mayan/Sonora Nulleja Tribe is from Mexico and potential membership would not implicate ICWA. The court then made another finding ICWA did not apply and directed the parties to contact the social worker or any of the participating attorneys if new information was obtained.

Both the maternal and paternal grandmothers attended a hearing on July 9, 2025. The court asked them both about possible Native American ancestry. The maternal grandmother denied such ancestry. The paternal grandmother again stated her great-great-grandmother had Native American ancestry but was not a member of a tribe. This relative was named Francisca V., and she was "Yaqui in the Sonora." Francisca V. died in 1991. When questioned about whether anyone else might have more information, the paternal grandmother said that her father, Guadalupe L., a paternal great-

26

grandfather, might. Because the record did not contain a written response from the Pascua Yaqui Tribe, or any written documentation of a telephone conversation between the social worker and the tribe, the court continued the hearing.

In an addendum report submitted for a July 23, 2025 hearing, the Agency included an email response from the Pascua Yaqui Tribe dated July 8, 2024. This email stated that none of the individuals whose names and biographical information had been submitted to the tribe, including A.L., his father, or any of the paternal relatives, were eligible or enrolled members of the tribe. The court found ICWA did not apply.

Mother and Father contend the Agency failed in its ICWA inquiry duties in multiple ways: (1) by not providing the name of A.L.'s great-great-great-grandmother to the Pascua Yaqui Tribe; (2) by not conducting and documenting an initial inquiry with A.L.'s maternal second cousin, Angel R.; (3) by not providing known dates of birth of various individuals to the Pascua Yaqui Tribe; (4) by not asking an unidentified "paternal aunt" who visited with A.L. about possible Native American ancestry; (5) by failing to document whether an unnamed "paternal uncle" who was questioned by the court about possible Native American ancestry was "the only paternal uncle or if he was in fact a great-uncle," thereby "mak[ing] it difficult to determine who was interviewed and who was not"; and (6) by possibly not sending a letter to a maternal uncle identified by Mother as "Jonathon," even though the record does not indicate the family provided contact information for this individual. The Agency concedes error with respect to the first two contentions but asserts no ICWA error occurred in connection with the remaining contentions.

27

We accept the Agency's concessions regarding the first two of the complaints listed above. For example, with respect to the first conceded contention, it is clear that paternal family members claimed Yaqui and Mayan ancestry, and the Agency attempted to pursue further inquiry of family members and contacted the Pascua Yaqui Tribe with genealogical information obtained from A.L.'s paternal relatives. The tribe responded that neither Father nor A.L. were members or eligible for membership. However, the information provided to the tribe did not include the name of the paternal great-great-great-grandmother, Francisca V., which had been shared with the court at a hearing on July 9, 2025. As the Agency concedes, it should have provided Francisca V.'s name to the tribe, and the failure to do so constitutes error warranting conditional reversal.

As to the second conceded contention, Mother asserts the record demonstrates A.L.'s maternal second cousin, Angel R., who was contacted regarding a potential placement, was not asked at that time about her knowledge of possible Indian ancestry during that contact, even though she had earlier been sent a letter but had not responded to it. A second cousin is an "extended family member" within the meaning of section 224.1, subdivision (c)(1), and the Agency acknowledges that it should have followed up with Angel R. to ask about possible Native American ancestry upon making additional contact. The Agency further concedes this also constitutes error warranting conditional reversal.

We agree with the Agency, however, that it did not commit ICWA error with respect to the question of providing birthdates to the tribe. The parents argue the Agency's inquiry in connection with the Pascua Yaqui Tribe was insufficient because the Agency did not provide birthdates of relevant individuals to the tribe. In the tribe's response, in which it concluded none of

28

the individuals named in the Agency's inquiry were members, the tribe did not indicate it had been provided insufficient information to make its determinations, nor did it suggest that additional information such as birthdates might yield a different result. Section 224.2, subdivision (e)(2)(C), states, in relevant part "[c]ontact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or citizenship eligibility determination." (§ 224.2, subd. (e)(2)(C).) Because the record does not indicate the tribe identified birthdate information was necessary for it to make a membership eligibility determination for A.L., there was no insufficiency in this aspect of the Agency's ICWA inquiry.

Although we are also not wholly convinced that Mother and Father's additional arguments related to unidentified additional relatives rises to the level of ICWA error, we have no need to address these contentions separately because the Agency has agreed that to the extent there are any additional available extended family members who have not yet been contacted, it will make contact and conduct any necessary IQWA inquiry with them. Thus, as part of the limited remand, the Agency is to review the record and conduct interviews with or issue letters to any "extended family members" who can be identified and are available to the Agency but may not yet have been contacted.

Because of the conceded insufficiencies in ICWA inquiry, the record does not contain substantial evidence to support the juvenile court's implied findings that the Agency made a proper and adequate inquiry and ICWA did not apply. We therefore conditionally reverse the order terminating parental rights with a limited remand for the Agency to comply with ICWA and section 224.2. (See *Dezi C., supra*, 16 Cal.5th at p. 1141.)

29

DISPOSITION

We conditionally reverse the juvenile court's order terminating Mother's and Father's parental rights. We remand to the juvenile court for the limited purpose of complying with the inquiry provisions of ICWA and related California law.

On remand, the Agency is directed to (1) provide the name of A.L.'s paternal great-great-great-grandmother, Francisca V., to the Pascua Yaqui Tribe, (2) recontact maternal second cousin, Angel R. to inquire about possible Native American ancestry, and (3) inquire of any additional available extended family members who become known to the Agency regarding possible Native American ancestry, consistent with the Agency's duty of continuing inquiry under section 224.2, subdivision (a).

If, after additional inquiry and notice to the Pascua Yaqui Tribe of the paternal great-great-great-grandmother's name and any other relevant information and after any other additional inquiry of extended family members, neither the Agency nor the juvenile court has reason to believe A.L. has Native American ancestry, the order shall be reinstated. Alternatively, if, after inquiry, the Agency or the juvenile court has reason to believe or knows A.L. has Native American ancestry, the juvenile court shall proceed in conformity with ICWA and related California law.

In all other respects, we affirm the orders.

DO, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.